FRANCIS WARREN *vs.* SPENCER WATER COMPANY.

Worcester.    Oct. 7, 1886. — Jan. 4, 1887.    DEVENS & W. ALLEN, JJ., absent.

At the trial of a petition for the assessment of damages caused by the taking by the respondent, a water company, of the water of a certain pond, and diverting it from flowing in its natural channel through the petitioner's land, it appeared that the respondent, in 1883, acting under its charter, took the water of the pond; that the petitioner owned land near by, through which a brook from the outlet of the pond flowed ; that, some three miles down stream, the S. Company owned mills, and claimed to own the right to stop the flow of the water from the pond by a dam at the outlet, and also to draw down the water through the outlet, at its pleasure ; that, about seven months after the respondent had taken the water of the pond, the S. Company conveyed to the respondent all its right in and to the water of the pond ; that, in 1774, the proprietors of the common and undivided lands in the town where the pond was situated passed a vote, giving to one D. the right to drain off the water of the pond, and to build a dam at the mouth of it; and that a succession of deeds followed, beginning with one from D., with another from his representatives in 1818, and finally coming down, by mesne conveyances, to the S. Company, granting such rights as the grantors respectively had to the use of the pond and the outlet thereof, for stopping or letting off the water of the pond. The respondent asked the judge to rule that the respondent, by the deed from the S. Company, acquired and succeeded to the rights of that company in the pond and in the outlet thereof in all respects, whether for stopping or letting off the water from the pond ; and that the deeds in this case showed a right in the S Company to stop and let down the water in the pond at its pleasure, and its right was conveyed to the respondent. The judge declined so to rule, and instructed the jury that a prescriptive right might be acquired by the respondent and those under whom it claimed to regulate the flow of the water of the pond, but that it must allow the water of the pond to flow through the channel of the brook, and that the deeds were only some evidence of a prescriptive right to regulate the flow of water. *Held*, it being

conceded that the grant to D. was only for his life, that the respondent had no
.ground of exception.

At the trial of a petition for the assessment of damages caused by diverting a
stream from flowing through a meadow of the petitioner, which had never been
used for the cultivation of cranberries, although cranberries grew on it in a wild
state, the petitioner claimed damages for the loss of the possible use of his
meadow for the cultivation of cranberries; and was allowed to ask a witness —
who had never cultivated cranberries, but who knew of a cranberry bog, who
was connected with a company interested in cranberry meadows, who had seen
the petitioner's land once, and who thought he knew something about cranberry
culture, although he had never made any experiments in the raising of cranber-
ries, or in the flow of water over them — what in his judgment was the value of
the water that would be sufficient to flood the petitioner's meadow. *Held,* that
the respondent had no ground of exception.

A bill of exceptions which merely states that a party offered the testimony of a
witness on a certain point, and the judge excluded it, and does not state what
the witness would have testified, shows no ground of exception.

At the trial of a petition for the assessment of damages caused by the taking by
the respondent of the water of a pond, and diverting it from flowing in its
natural channel through the petitioner's land, a bill of exceptions, alleged by
the respondent, set forth that, on cross-examination of a witness called by the
respondent, the petitioner was allowed to ask the witness as to a settlement
made by the witness with the respondent for damages caused to the land of the
witness by the same taking. The bill of exceptions did not state what the wit-
ness testified to on his direct examination. *Held,* that no ground of exception
appeared.

The declarations of a juror, after the verdict in a case has been rendered, as
to his reasons for arriving at the verdict, and the manner in which the ver-
dict was arrived at by the jury, are inadmissible in support of a motion for a
new trial.

PETITION for the assessment of damages caused by the taking
by the respondent, under the St. of 1882, c. 119,* of the water
of Shaw Pond in Leicester, and diverting it from flowing in its
natural channel through the petitioner's land. Trial in the Su-
perior Court, before *Bacon,* J., who allowed a bill of exceptions,
in substance as follows:

Shaw Pond is one of the great ponds of the Commonwealth,
at the outlet of which a dam has existed since the memory of
man. The respondent actually took the waters of the pond on
January 26, 1883. Below the pond the petitioner owned a piece
of meadow land, suitable for raising cranberries, traversed by
the brook from the outlet of the pond. The meadow had never
been appropriated to the cultivation of cranberries, but cranber-
ries grew there in their wild state.

---

* See *ante,* 10.

Some three miles beyond, the Spencer Wire Company owned mills and a reservoir. In 1774, the proprietors of the common and undivided lands in Leicester passed a vote authorizing Samuel Denny, who owned land on the westerly side of Shaw Pond, then called North Pond, through which the brook leading from the outlet of the pond ran, "to drain off the water [of the pond] for the use of his mill as low as he may think proper, and build a dam on the mouth of said pond to raise the water in said pond, provided it do no damage to private property."

In 1778, Samuel Denny sold to Nathan Hersey sixty-one acres of land on North Pond, through which the brook leading therefrom flowed, " reserving liberty to flow or lower the pond aforesaid at his pleasure." This piece of land, in 1821, came by mesne conveyances to Robert Watson, and on it a dam was erected ; which more than twenty years before January 26, 1883, was abandoned. It was designated at the trial as the upper privilege.

In 1818, Daniel Denny and William Denny, described as administrators with the will annexed of the estate of Samuel Denny, and as acting by virtue of a license granted by the Circuit Court of Common Pleas, conveyed to John Boyden another part of Samuel Denny's real estate, now known as the Noone farm, with a grist-mill, known at the trial as the Willis mill, and also conveyed " all the right the said Samuel Denny had to raise and draw off the Shaw Pond, so called, for the use of the grist-mill aforesaid." In 1818, John Boyden quitclaimed to Abner Snow all his right in the water of Shaw Pond. Abner Snow became in 1818 the owner of the present Noone farm, and operated the mill thereon until his death, about 1844, when the farm and mill were sold to Roswell Bisco. In 1854, the mill and the farm had, by mesne conveyances from Roswell Bisco, come to Stella J. Willis, whose husband was John W. Willis, and the mill was carried on by John W. Willis until 1862, when the mill and its privileges were sold to Francis L. Willis. In 1840, Robert Watson sold the upper privilege, with right of flowage and all his rights of stopping and letting off the waters of Shaw Pond, to Henry E. Warren. In 1854, Henry E. Warren sold to J. W. Willis all his right of stopping or letting off the water of Shaw Pond relinquished to him by Robert Watson. In 1862, John W.

Willis quitclaimed to Francis L. Willis all the rights in Shaw Pond conveyed to him by Henry E. Warren.   In 1863, Francis L. Willis sold the old mill and certain mill privileges on the Noone farm, together with the right to the water of Shaw Pond, to Myrick and Sugden.   The remainder of the present Noone farm having been conveyed to Richard Condrick, Myrick and Sugden, in 1864, conveyed the old mill-dam and the land on which it stood and the land under the old mill-pond to him, but reserved "to the said Myrick and Sugden, their heirs and assigns forever, all the right, title, and interest in and unto Shaw Pond in said Leicester.   And it is distinctly understood that the said Condrick, his heirs and assigns, shall not draw water from said Shaw Pond, or stop the water from said pond on the above described dam."   On August 20, 1883, the Spencer Wire Company, which had by mesne conveyances succeeded to all the rights of Myrick and Sugden, conveyed to the respondent all its rights in and to the water of Shaw Pond.

There was evidence tending to show that Abner Snow and the other occupiers of the Willis mill were accustomed, and claimed the right, to regulate the flow of the waters of Shaw Pond as the needs of the mill required, and that this use was acquiesced in by all parties.   There was also evidence tending to show that Myrick and Sugden, and the Spencer Wire Company under them, from the time of their deed from Francis L. Willis, used and claimed the right to use Shaw Pond as a storage reservoir to supply their mills, three miles below, in dry weather, and tightened the dam and regulated the flow of water at the mill, and that this use was acquiesced in by all parties ; that they usually opened the gate in the dam at the outlet of Shaw Pond in the month of July, August, or September, according to their need for the water, and according to the season, whether wet or dry, and let the water run for a month or six weeks, and then closed the gate and kept it closed until the next summer ; and that one season the gate was not opened at all.   The evidence was conflicting as to whether, when the gate was closed, sufficient water came through the outlet to keep the stream on the petitioner's land full and ample for his use.

There was evidence tending to show that the petitioner's land was a meadow, upon which cranberries had been growing in a

wild state for many years; that the meadow had not been flowed for more than thirty years, except as it was flowed by the flush of water let down from the pond in the summer and fall months, when the gate was opened.

On the question of damages, the petitioner introduced Edwin H. Hutchinson, a farmer, who testified, that he had not been particularly interested in cranberry cultivation; that he knew of a cranberry meadow; that he was connected with a company in Sutton interested in cranberry meadows; that he had once seen the petitioner's meadow, two or three weeks before the trial; and that he knew nothing about the flow of water from Shaw Pond. He was then allowed to testify, against the objection of the respondent, that in his judgment the value of the water that would be sufficient to flow the petitioner's meadow for the protection of cranberries was $300.

On cross-examination, the witness testified that he was not engaged in the cranberry business, but thought he knew something about cranberry culture; that he was conversant with a cranberry bog, adjoining his land, which had been cultivated; that he never owned a cranberry bog himself, and had never made any experiments in the raising of cranberries, or in the flow of water over cranberries, but had seen them made by others.

The respondent then asked that the testimony of the witness on the question of damages be stricken out. The judge ruled that, as the testimony was admitted under the respondent's exception, it could not be stricken out.

On the question of adverse user, the respondent offered by one Sugden, who was one of the grantees of Willis, evidence of statements as to Willis's manner of using and regulating the flow of water from Shaw Pond, made by Willis to him when he, Willis, owned the Willis mill; but, upon the objection of the petitioner, the judge excluded the evidence.

The respondent offered as a witness, upon the question of damages, one Edward Warren, who was allowed to testify, on cross-examination, against the respondent's objection, that he had brought a suit against the Spencer Water Company, which it had settled by paying him $100 for the right to lay pipes through his land, $200 for the water, and $25 for repairing walls and fences.

The respondent asked the judge to rule as follows: "1. The respondent, by the deed of August 20, 1883, acquired and succeeded to the rights of the Spencer Wire Company in Shaw Pond, and also in the outlet thereof, in all respects, whether for stopping or letting off the water from said pond. 2. The deeds in this case show a right in the Spencer Wire Company to stop and let down the water in Shaw Pond at its pleasure, and its right was conveyed to the respondent."

The judge declined so to rule, but instructed the jury that a prescriptive right might be acquired by the respondent, and those under whom it claimed, to regulate the flow of the waters of Shaw Pond, but that it must allow the water of Shaw Pond to flow through the channel of the brook; and that the deeds were only some evidence of a prescriptive right to regulate the flow of water.

The jury returned a verdict for the petitioner in the sum of $354; and the respondent alleged exceptions.

After the verdict was returned, the respondent moved to set it aside, for the following reasons: "1. Because the verdict in said case was, so far as the damages are concerned, ascertained by an agreement of the jury that each juror should set down any sum he thought best, and the aggregate should be divided by twelve, and the result so obtained should be returned as the verdict, and the verdict returned was arrived at in pursuance of said agreement. 2. Because a juror before whom the case was tried was influenced to render an excessive verdict, against the evidence, because the respondent was a corporation and the petitioner reputed to be in needy circumstances."

The motion was supported by an affidavit of one George Wilson, who deposed that, a short time after the verdict of the jury was returned, he had a conversation with one Rufus L. Day, a juror in the case, who, in speaking of the verdict, said, that he knew and believed that the verdict so rendered was largely in excess of what should have been given; that, in fact, there was really no damage or but little damage to the petitioner, but his reason for arriving at said verdict was that the respondent was a rich corporation, while the petitioner was a poor man, and the respondent could afford, and for that reason ought, to give the petitioner something handsome; and that the verdict was arrived

at in the following manner: the jury agreed, among themselves, that each juryman should mark on a piece of paper an amount of money; that the total of the sum so marked should be divided by twelve, and the result so obtained should be the verdict of the jury; that then the jury proceeded to cast the lots, the sum marked by the several jurors ranging in amounts from one dollar to four thousand dollars; and that, the various sums so marked being added together, the total amount was divided by twelve, and the result thus obtained was returned as the verdict in said case.

At the hearing upon this motion, the respondent called said Wilson, who testified that he knew Rufus L. Day; that Day sat as a juror in this case; and that, after the verdict was returned, he had a conversation with Day as to his reasons for arriving at the verdict. The witness was then asked to state the conversation. On the objection of the petitioner, *Bacon*, J., excluded the testimony; and overruled the motion. The respondent alleged exceptions.

*H. W. King*, for the respondent.

*J. Hopkins*, for the petitioner.

C. ALLEN, J. The respondent's requests for instructions to the jury were material only upon the question of damages. The questions arise thus:

The respondent, acting under its charter, took the water of Shaw Pond in Leicester on January 26, 1883. The petitioner owned land near by, through which the outlet from the pond flowed; and he brought this petition for an assessment of the damages caused by the respondent's act of taking the water, and diverting it from flowing in its natural channel through his land. Some three miles down stream, the Spencer Wire Company owned mills, and claimed to own the right to stop the flow of the water from Shaw Pond by a dam at the outlet, and also to draw down the water through the outlet, at its pleasure. This right, if it existed, might naturally be presumed to diminish the value of the petitioner's right to the flow of the water through his land. On August 20, 1883, about seven months after the respondent had taken the water of the pond, the Wire Company conveyed to the respondent all its right in and to the water of the pond.

The origin of the Wire Company's right or claim was in this way. In 1774, the proprietors of the common and undivided lands in Leicester passed a vote giving to Samuel Denny the right to drain off the water of the pond, and to build a dam at the mouth of it. It was said in the course of the argument, (and, without examination, we assume the fact to be so,) that by an early statute the Commonwealth had granted to Leicester the water of the pond. It was conceded by the counsel for the respondent that this grant to Denny was limited to the period of his life. Then followed a succession of deeds, beginning with one from Denny himself, with another from his administrators in 1818, and finally coming down by mesne conveyances to the Spencer Wire Company, granting such rights as the grantors respectively had to the use of Shaw Pond and the outlet thereof, for stopping or letting off the water of the pond. It is thus apparent that the only right which the Wire Company could have was a right by prescription. The original proprietors made no grant except that to Denny for his life, and nobody since has acquired any greater right than what may have been gained by prescription. It was indeed suggested in argument, that some greater right may have been acquired by means of a lost deed; but there is no presumption of any lost deed conveying a greater right than is shown by the adverse use of the water, so that nothing can be thus added to the prescriptive right.

Under this state of things, the respondent's requests for instructions were presented, which, as already remarked, could be material only upon the question of damages. These requests appear to have been designed to present the question of the validity of the conveyance by the Wire Company to the respondent of its right in and to the water of the pond. It is contended by the respondent, that it had a right to acquire by purchase the rights of the Wire Company in Shaw Pond and its outlet, that it was not debarred by its charter from doing so, and that the court in effect ruled at the trial that it could not under its charter acquire this right. The petitioner, on the other hand, contends that under its charter the respondent had not this authority, that its only rights were those given by its charter to take the water for a specific purpose, and that the propositions contained in the rulings prayed for had nothing to do with the case.

Assuming that the respondent is right in this contention, we do not see that it would be injured by a refusal to grant its requests.  The respondent, being liable in damages to the Wire Company for the injury caused to its alleged prescriptive rights by the withdrawal of the water, might properly purchase and take an assignment of all the rights of the Wire Company, as a method of satisfying its claim for damages.  Granting this, and granting that the court might properly have instructed the jury in the terms requested, and that the respondent thereby acquired all the rights of the Wire Company, no inference arises that the petitioner's right to damages would be increased by a refusal to give such instructions.  The respondent was bound to make compensation both to the Wire Company for the injury done to its prescriptive rights, and to the petitioner for the injury done to him.  The damages to which both were entitled must have been determined with reference to the injury sustained at the time of the taking of the water.  At that time, *ex hypothesi*, the petitioner's right to the natural ·flow of the water through his land was limited by the prescriptive right of the Wire Company to regulate and control the flow; and for this reason the damages which he would be entitled to recover would be less than they would have been if the Wire Company had not had such prescriptive right.  Settling with the Wire Company at a later date, in whatever form the settlement was made, clearly would not enure to the benefit of the petitioner, or increase his right to damages, because he could only recover the value of what he was deprived of.  In declining to instruct the jury in the terms requested, the court gave no instruction and no intimation that the petitioner would or could have a right to greater compensation for the injury to his property, in case the respondent did not acquire and succeed to the rights of the Wire Company in Shaw Pond.  The question to be determined was, what amount of damages the petitioner was entitled to recover.  Upon this question, it was quite immaterial whether the conveyance by the Wire Company to the respondent was valid or invalid, or whether or not the respondent had in any form settled with the Wire Company.  If we could see that the court left the jury at liberty to increase the petitioner's damages by treating the conveyance as invalid, we should think the

exceptions ought to be sustained on this ground. But we draw no such inference from the bill of exceptions.

It should perhaps be added, that we are unable to see that the instructions of the court, which were actually given, were equivalent to a ruling that the respondent could not, under its charter, acquire all the rights of the Wire Company in Shaw Pond. We should have said, on reading the bill of exceptions, that the effect of the instructions given was, that the respondent might acquire the prescriptive right, and that the deeds were some evidence, though not conclusive, of the existence of such right. It being plain that there was no other right than a prescriptive one to regulate the flow of the water, an instruction that such right might be acquired, and that the deeds were some evidence of its existence, would cover all that the facts of the case called for. However, since both parties appear to have understood the instructions otherwise, we do not place the decision on this ground.

Various exceptions were also taken by the respondent, in matters of evidence.

The testimony of Hutchinson was upon a subject affecting the value of the petitioner's right to the flow of water, namely, the possible use of his land for a cranberry meadow; and, although the qualifications of the witness to testify to an opinion appear to have been slight, we do not think the admission of his testimony calls for a new trial. Much must be left to the discretion of the presiding judge, in determining the qualifications of witnesses in such cases. See *Commonwealth* v. *Sturtivant*, 117 Mass. 122, 137.

There was nothing to show what Sugden would have testified that Willis said; so there is no room for an argument that the respondent was injured by the exclusion of his testimony. It has been often decided, in such cases, that the bill of exceptions must contain enough to enable the court to see that the party was actually injured.

The testimony of Warren, as to the settlement made for damages caused to his land, was certainly irrelevant and immaterial, as affecting the question of the petitioner's damages. But he was called by the respondent, and presumably testified in its favor, though his testimony on his direct examination is not

given. If he testified, on direct examination, that the plaintiff's injury was very slight, his answers on cross-examination may have had a legitimate tendency to impair the weight of that testimony. We cannot say that its admission requires the granting of a new trial.

The testimony offered in support of the respondent's motion for a new trial was merely to declarations made by a juror after the verdict had been rendered, as to his reasons for arriving at the verdict, and the manner in which the verdict was arrived at by the jury. But a juror cannot thus destroy the effect of the verdict which he has given. If his direct testimony to his own misconduct in the jury-room had been offered for that purpose, it could not have been received. *Woodward* v. *Leavitt*, 107 Mass. 453, 471. *A fortiori*, his subsequent declarations cannot.

*Exceptions overruled.*